UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES JAUDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13-CV-1068-SPM |
| | ) | |
| PROGRESSIVE PREFERRRED | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Progressive Preferred Insurance Company's ("Progressive's") motion for summary judgment and plaintiff James Jaudes' ("Jaudes'") cross-motion for summary judgment.[1]  For the following reasons, the Court will grant Progressive's motion for summary judgment and deny Jaudes' cross-motion for summary judgment.

## I.  BACKGROUND

Jaudes was injured on January 28, 2010, when his car collided with a vehicle being operated by Derick Cook ("Cook").  Cook carried liability insurance with policy limits of $50,000, and that amount was tendered to Jaudes.  Although the total amount of Jaudes' damages is unclear from the record, in his Amended Complaint Jaudes asserts that his damages far exceed the limits of liability insurance tendered by Cook.  At the time of the accident, Jaudes was insured under an auto liability insurance policy issued by Progressive.  Progressive's policy provided underinsured motor vehicle coverage in the amount of $50,000 per person and

_____

[1] Both parties have consented to the jurisdiction of the undersigned Magistrate Judge, pursuant to 28 U.S.C. §636(c)(1). (Doc. 12).

$100,000 per occurrence for each of three vehicles owned by Jaudes, including the vehicle involved in the collision with Cook. Jaudes made demand on Progressive for payment of $150,000 under the underinsured motorist ("UIM") provisions. Progressive refused to make payment, and Jaudes brought this action for breach of contract.[2]

Progressive moved for summary judgment, arguing that Jaudes is not entitled to coverage because the definition of underinsured motor vehicle used in its policy is unambiguous and Cook's vehicle does not meet the policy's definition of an underinsured motor vehicle. Progressive also posits that its policy does not allow Jaudes to stack the three UIM limits of liability to create a total combined policy limit of $150,000. (Doc. 21, 22). Jaudes filed a cross-motion for summary judgment, contending that he is entitled to judgment as a matter of law in light of an opinion that was issued by the Missouri Court of Appeals for the Western District just as the parties were completing their briefing of Progressive's motion for summary judgment. More specifically, Jaudes contends that under *Fanning v. Progressive Northwestern Insurance Co.*, 412 S.W.3d 360 (Mo. Ct. App. 2013), the policy's definition of underinsured motor vehicle is rendered ambiguous by the declarations page and other provisions in the policy. Jaudes further contends that, notwithstanding Progressive's arguments to the contrary, Missouri law permits stacking of the three UIM limits in Progressive's policy.

---

[2] Jaudes initially filed a petition in state court alleging breach of contract arising from Progressive's refusal to pay his claim and asserting entitlement to additional damages based on Progressive's vexatious refusal to pay. Progressive removed the action to this court on June 6, 2013. In his opposition to Progressive's summary judgment motion, Jaudes characterized his claim in this court as one for declaratory relief. (Doc. 24, at p. 2). However, neither Jaudes' state court petition nor his Amended Complaint before this Court contains a claim for declaratory relief; they assert only a claim for breach of contract.

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The standards applicable to summary judgment motions are well settled, and they do not change when both parties have moved for summary judgment. *See Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *Tower Rock Stone Co. v. Quarry & Allied Workers Local No. 830*, 918 F. Supp. 2d 902, 905 (E.D. Mo. 2013).   Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).  The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation marks omitted).  "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted)).

Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. *Husinga v. Federal-Mogul Ignition Co.,* 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager*, 716 F.2d at 1214.

## III.   FACTS[3]

The material facts are not in dispute.  On January 28, 2010, Jaudes was involved in a motor vehicle collision with Derick Cook, in which Jaudes was injured.  Jaudes claims that, as a result of the collision with Cook, Jaudes sustained damages in excess of $50,000.[4]  At the time of the accident, Jaudes was insured under an auto liability insurance policy issued by Progressive.  At the time of the accident, Cook's vehicle was insured with policy limits of $50,000.  The policy limits of $50,000 were tendered to Jaudes.

The car Jaudes was driving at the time of the accident was insured under Progressive Policy No. 31245848-0, along with two other cars owned by Jaudes.  The parties do not dispute the policy language contained therein.

The "Declarations Page" of the Progressive Policy states:

**Auto Insurance Coverage Summary**
This is your Declarations Page

***

This coverage summary replaces your prior one.  Your insurance policy and any policy endorsements contain a full explanation of your coverage.  The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle. . . .

The declarations page contains an "Outline of Coverage" that lists each of Jaudes' vehicles.  For each vehicle, there is a line indicating that the coverage includes "Underinsured Motorist" with "Limits" of "$50,000 each person/$100,000 each accident."  A separate underinsured motorist premium is listed for each vehicle.

---

[3] These facts are taken from the parties' statements of undisputed facts.  (Docs. 26, 34, 36).

[4] Although the precise amount of Jaudes' damages is unclear, the parties appear to assume in their briefs that those damages exceeded $50,000.  Thus, for purposes of resolving the instant motions, the Court will assume that Jaudes' damages exceeded $50,000.

The underinsured motorist provisions in the Progressive policy are contained in Part III(B) and provide in relevant part as follows:

## Part III(B) – UNDERINSURED MOTORIST COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury**:

1. sustained by that **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance, or use of an **underinsured motor vehicle**.

**We** will pay under this Part III(B) only after the limits of liability under all applicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements.

\*\*\*

### ADDITIONAL DEFINITIONS

When used in this Part III(B): . . .

2. "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type for which the sum of the limits of liability under all bodily injury liability bonds or policies applicable at the time of the accident is less than the coverage limit for the Underinsured Motorist Coverage shown on the **declarations page**.

\*\*\*

### LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Underinsured Motorist Coverage will be reduced by all sums:

1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible . . .

The limit of liability shown, subject to all applicable reductions, will apply regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;

5. vehicles involved in the accident; or
6. premiums paid

If **your declarations page** shows a split limit:
1. The amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person; and
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident.

These limits are subject to all applicable reductions to the limit of liability set forth above.

\*\*\*

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

**OTHER INSURANCE**

If there is other applicable underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered auto** will be excess over any other underinsured motorist coverage.

## IV.    DISCUSSION

In its motion for summary judgment, Progressive posits that Jaudes' breach of contract claim fails as a matter of law because Jaudes is not entitled to underinsured motorist coverage for his damages under the terms of the policy. Progressive advances two arguments in support of its position. First, Progressive contends that the definition of "underinsured motor vehicle" used in the policy is unambiguous, and that the undisputed facts show that Cook's vehicle does not meet that definition because his vehicle's liability limit is not "less than" the Progressive policy's $50,000 UIM limit. Second, Progressive contends that because its policy contains clear and unambiguous anti-stacking provisions, Cook's vehicle cannot be shoe-horned into the policy's definition of an "underinsured motor vehicle" by construing the policy to permit stacking of the

three underinsured motorist limits of $50,000 per person, to create a combined policy limit of $150,000. (Doc. 21, 22).

Under Missouri law, which applies in this diversity case, the rules governing the interpretation of insurance policies are well settled. A court must apply the general rules of contract construction when interpreting an insurance policy, because insurance policies are contracts. *See Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007). A court must give the contract's terms their plain and ordinary meaning, unless a term is defined in the policy or is ambiguous. *See Farmland Indus. Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 508 (Mo. 1997). A court should apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010). In addition, "[c]ourts should not interpret policy provisions in isolation but rather evaluate policies as a whole." *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009). Finally, in interpreting an insurance contract, the court must "endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant." *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. Ct. App. 2008).

"'The key is whether the contract language is ambiguous or unambiguous.'" *Todd*, 223 S.W.3d at 160 (quoting *Peters v. Emp'rs Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. 1993)). A term is ambiguous only if it is reasonably open to different constructions and there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. *Burns*, 303 S.W.3d at 509 (citing *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007)). If an insurance clause "appears to provide coverage but other clauses indicate that such coverage is not provided, then the policy is ambiguous." *Seeck*, 212 S.W.3d at 134. However, a court must not "unreasonably distort the language of a policy or exercise inventive powers for the purpose of

creating an ambiguity when none exists." *Todd*, 223 S.W.3d at 163. When an ambiguity exists in an insurance policy, the court must interpret the policy in favor of the insured. *Id.* at 160. If, however, the policy is unambiguous, the court must enforce the contract's terms as written. *Id.*

Progressive concedes that if stacking were permitted, Cook would be the operator of an "underinsured motor vehicle," as that term is defined in the policy; as such, I begin by applying the foregoing principles to Progressive's contention that its policy prohibits stacking of the underinsured motorist coverage provided for Jaudes' three vehicles.

### A.   STACKING

"'Stacking' refers to an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle.'" *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009) (quoting *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.*, 992 S.W.2d 308, 313 (Mo. Ct. App. 1999)). Because Missouri statutes do not mandate underinsured motorist coverage, whether underinsured motorist coverage limits may be stacked is determined by the language of the contract. *Id.*

The declarations page of Progressive's policy describes three covered vehicles, each with "underinsured motorist" coverage of $50,000 each person/$100,000 each accident. Pointing to various provisions in the policy, Progressive argues that stacking of those amounts is clearly and unambiguously prohibited by the language of the policy. First, the declarations page itself states, "The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle." Second, the Progressive Policy's "Limits of Liability" section contains the following language, which the parties refer to as an "anti-stacking clause":

> The limit of liability shown, subject to all applicable reductions, will apply regardless of the number of:
> 1. claims made;
> 2. **covered autos**;
> 3. **insured persons**;
> 4. lawsuits brought;
> 5. vehicles involved in the accident; or
> 6. premiums paid
>
> \*\*\*
>
> If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

As Progressive correctly points out, Missouri courts have previously held that similar language prohibits stacking of underinsured motorist coverage. *Corrigan v. Progressive Ins. Co.*, 411 S.W.3d 306, 312-15 (Mo. Ct. App. 2013) (holding stacking was prohibited by virtually identical language in another Progressive policy); *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 383-84 (Mo. 1991) (holding stacking was prohibited by language stating, "The limit of liability shown in the schedule for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of . . . Vehicles or premiums shown in the Declarations."); *Stewart v. Liberty Mut. Fire Ins. Co.*, 349 S.W.3d 381, 385-88 (Mo. Ct. App. 2011) (holding stacking was prohibited by language stating, "The limit of liability shown in the schedule or in the declarations for each person for underinsured motorist coverage is our maximum limit of liability for all damages. . . . This is the most we will pay regardless of the number of . . . Vehicles or premiums shown in the schedule or in the declarations").

Progressive further argues that the cases in which Missouri courts have allowed stacking of underinsured motorist coverages involved situations in which an insured was injured while occupying a vehicle that he or she did not own or that was otherwise not covered under the

policy. In those instances, Missouri courts have held that an ambiguity may exist when an "Other Insurance" clause describing what happens if the injury occurs in a non-owned or non-covered vehicle is read together with anti-stacking provisions in a policy. The Missouri Supreme Court's decision in *Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132, 137-38 (Mo. 2009), is one such example.

In *Ritchie*, the insureds' daughter was killed in an accident while occupying a motor vehicle the insureds did not own. The insureds had a policy providing underinsured motorist coverage of $100,000 per person for each of the three vehicles they owned. *Id.* The policy contained both anti-stacking provisions and a provision entitled "Other Insurance" that stated, "Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage." *Id.* at 137. The court held that an "ordinary person of average understanding reasonably could interpret this other insurance provision to mean that when an injured insured is occupying a non-owned vehicle and there are multiple underinsured motorist coverages . . . then each of the underinsured motorist coverages are excess to the other, and, therefore, may be stacked." *Id.* at 138 (citation and quotation marks omitted). It reasoned that the Other Insurance provision suggested "that the policy's anti-stacking provisions, which might normally and otherwise apply, do not apply in the special situation where the insured is injured while occupying a non-owned vehicle." *Id.* at 137-38 (quotation marks omitted). The court resolved the ambiguity in favor of the insureds and found that the policy permitted stacking. *Id.* at 138. *See also Manner v. Schiermeier*, 393 S.W.3d 58, 66 (Mo. 2013) (stating, "here, the second sentence of the 'other insurance' clause appears to an 'ordinary person of average understanding' to permit stacking because it states that 'any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible

underinsured motorist coverage'"; finding that any inconsistency with anti-stacking language elsewhere in the policy must be resolved in favor of the insured and in favor of stacking).  As Progressive correctly points out, the undisputed facts of this case make it distinguishable from the facts of the foregoing cases in which Missouri courts have permitted stacking of underinsured motor coverages.

In response, Jaudes cites *Clark v. American Family Mutual Insurance Co.*, 92 S.W.3d 198 (Mo. Ct. App. 2002), to support the proposition that there are circumstances in which Missouri courts will allow stacking even when the case does not involve a plaintiff who was injured while occupying a non-owned or non-covered vehicle.  Jaudes urges this court to find that, like the "Other Insurance" provisions at issue in *Clark*, the first two sentences of the "Other Insurance" clause in Progressive's policy could be read to override the policy's anti-stacking provisions "in situations where there is more than one policy providing underinsured motorist insurance."[5] (Doc. 24, at p. 17).  However, it is undisputed that this case does not present a situation in which there is "more than one policy providing underinsured motorist insurance." That fact makes this case distinguishable from *Clark.*

In *Clark*, the plaintiff had two separate insurance policies (each with a separate policy number and premium), covering two different cars, each with underinsured motorist coverage limits of $50,000.  *Clark*, 92 S.W.3d at 200.  The plaintiff was struck by a vehicle while standing

_____

[5]The first two sentences in the "Other Insurance" provision in Progressive's policy state: "If there is other applicable underinsured motorist coverage, **we** will pay only **our** share of the damages.  **Our** share is the proportion that our limit of liability bears to the total of all available coverage limits."  Jaudes does not rely on the last sentence of the Other Insurance clause, which states, "any insurance **we** provide with respect to a vehicle that is not a **covered auto** will be excess over any other underinsured motorist coverage," presumably because the collision at issue here did not involve any insurance provided by Progressive for a "vehicle that is not a covered auto."

at the side of a road (occupying neither of his covered vehicles), and he suffered damages. *Id.* at 199-200. After the driver of the other vehicle paid his $25,000 in policy limits, the plaintiff sought coverage under the underinsured motorist provisions of both of his insurance policies. Each policy contained an anti-stacking clause similar to the one in this case, stating that the limit of liability under the policy was the maximum that would be paid regardless of the number of vehicles described in the declarations or policies involved. *Id.* at 200. However, the "Other Insurance" clause of each policy's underinsured motorist coverage endorsement stated, in part:

> If there is other similar insurance on a loss covered by this endorsement, **we** will pay **our** share according to this policy's proportion of the total limits of all similar insurance.

*Id.* at 201. The court found that under this clause, although the stated maximum of each endorsement was $50,000, when each endorsement was considered, the "total limit of all similar insurance" was $100,000, and "[the insurer's] proportionate share [was] $50,000 under one policy and $50,000 under the other." *Id.* at 203.

It was critical to the holding in *Clark* that the insurer had issued two separate insurance policies and then promised to pay each policy's share. Under each policy, the other policy provided "other similar insurance," making the "total limits of all similar insurance" $100,000. Each policy contained the insurer's promise to pay *that policy's* share of those total limits, and enforcement of both promises had the effect of stacking coverage. Jaudes' reliance on *Clark* is misplaced. Here, there is only one policy, with a single underinsured motorist endorsement and a single promise to pay.

Other than *Clark*, Jaudes offers no authority or explanation to support his argument that the "Other Insurance" provision in Progressive's policy supports stacking in the absence of multiple insurance policies, and the Court is aware of no such authority. To find ambiguity here,

the Court would have to find that the "Other Insurance" clause in Progressive's policy could reasonably be read to permit stacking of coverage limits in all circumstances, despite the multiple clear statements prohibiting stacking of coverage limits elsewhere in the policy. Doing so would "unreasonably distort the language of a policy" or would require the Court to "exercise inventive powers for the purpose of creating an ambiguity when none exists;" this the Court may not do. *See Todd*, 223 S.W.3d at 163.

In sum, Progressive's policy does not permit Jaudes to stack the underinsured motorist coverage limits for his three vehicles; as such, the applicable policy limit is the $50,000 limit for the vehicle Jaudes was driving at the time of the collision.

### B.    DEFINITION OF "UNDERINSURED MOTOR VEHICLE"

In its motion for summary judgment, Progressive argues that Jaudes is not entitled to coverage under the underinsured motor vehicle provisions of the policy because Cook's vehicle does not meet the policy definition of an underinsured motor vehicle. Progressive's policy defines an underinsured motor vehicle as a vehicle "for which the sum of the limits of liability under all bodily injury liability bonds or policies applicable at the time of the accident is *less* than the coverage limit for the Underinsured Motorist Coverage shown on the declarations page." As discussed above, Cook's vehicle had a policy limit of $50,000, which is the *same* as the UIM coverage limit shown on the declarations page. Progressive contends that the policy definition should be enforced as written because it is clear and unambiguous and because there are no other policy provisions that inject ambiguity into the meaning of what is a covered "underinsured motor vehicle." In support of this argument, Progressive cites the Missouri Supreme Court's opinion in *Rodriguez v. General Accident Insurance Co. of America*, 808

S.W.2d 379 (Mo. 1991), and the Eighth Circuit Court of Appeals' recent decision in *Owners Insurance Co. v. Hughes*, 712 F.3d 392, 394 (8th Cir. 2013).

In *Rodriguez*, the Missouri Supreme Court analyzed a definition of underinsured motor vehicle that is substantively similar to the definition in Progressive's policy. Like Jaudes, the plaintiff in *Rodriguez* was injured in an accident with a negligent driver whose insurance company paid Rodriguez $50,000, the limits of liability of his policy. *Rodriguez*, 808 S.W.2d at 380. The plaintiffs' damages exceeded $50,000, and they sought recovery under their own insurance policy. *Id.* The face sheet of their policy stated that the plaintiffs had underinsured motorist coverage with a limit of $50,000, and the insuring agreement provided that the insurer would pay damages that the insured was entitled to recover from the owner of an "underinsured motor vehicle." *Id.* at 380-81. Much like Progressive's policy, the policy in *Rodriguez* defined "underinsured motor vehicle" as a vehicle whose "limit for bodily injury liability is less than the limit of liability for this coverage." *Id.* at 381. The insurer denied coverage on the ground that this definition was not satisfied. *Id.*

The *Rodriguez* plaintiffs argued that the term "underinsured motorist" was inherently ambiguous and that they were entitled to a resolution of the ambiguity consistent with their "objective reasonable expectations." *Id.* at 381-82. Specifically, they argued that the court should interpret the underinsured motorist coverage as excess coverage—in other words, coverage over and above what the tortfeasor's policy provided. *Id.* The Missouri Supreme Court rejected that argument, stating that the "objective reasonable expectations" doctrine does not apply unless the court first finds an ambiguity in the contract. *Id.* at 382. Analyzing the contractual language, the court stated, "Considering the clarity with which the underinsured motorist coverage is defined in the policy, we hold that it is neither ambiguous nor misleading."

*Id.* at 383. Notably, in *Rodriguez*, the Missouri Supreme Court rejected the Eighth Circuit's opinion in *Weber v. American Family Mutual Insurance Co.*, 868 F.2d 286 (8th Cir. 1989), as "inconsistent with Missouri law." *Rodriguez*, 808 S.W.2d at 383. In *Weber*, the plaintiff argued, as Jaudes does here, that the insurer's interpretation of the policy would render underinsured motorist coverage meaningless because an insured would never reach the limits of liability under any scenario. *See id.* at 382-83 & n.1 (citing *Weber*, 868 F.2d at 288); Doc. 33, at pp. 12-14. The Eighth Circuit in *Weber* rejected the plain language of the insurance contract before it and held that the underinsured motorist coverage was excess above payments from other sources. *Rodriguez*, 808 S.W.2d at 382-83 & n.1 (citing *Weber*, 868 F.2d at 288). The Missouri Supreme Court stated that *Weber* was "an example of a court creating ambiguity to distort the language of an unambiguous policy." *Rodriguez*, 808 S.W.2d at 383.

In *Owners Insurance Co. v. Hughes*, 712 F.3d 392, 394 (8th Cir. 2013), the Eighth Circuit held that the Missouri Supreme Court has left untouched its holding in *Rodriguez*. In rejecting an argument by the plaintiff that the Missouri Supreme Court had relegated the underinsured motorist language in *Rodriguez* to dicta, the Eighth Circuit held that the Missouri Supreme Court's recent decisions actually confirm the operative holding of *Rodriguez*. *Hughes*, 712 F.3d at 395. However, the Eighth Circuit recognized that decisions since *Rodriguez* make clear that the fact that a definition is clear and unambiguous does not necessarily end the inquiry as to the existence of an ambiguity. *Id.* at 396. It stated, "if other policy provisions inject ambiguity into the meaning of what is a covered 'underinsured motor vehicle,' then *Rodriguez* would not compel a finding of no coverage." *Id.*

The "excess insurance" provision analyzed by the Missouri Supreme Court in *Seeck v. Geico General Insurance Co.*, 212 S.W.3d 129, 132 (Mo. 2007), is an example of the type of

provision that could, under certain circumstances, inject ambiguity into the meaning of an otherwise unambiguous definition of an "underinsured motor vehicle." The plaintiff in *Seeck* was injured as a passenger in a vehicle accident and sustained serious and permanent damages. *Id.* at 131. The negligent driver who caused the accident was insured, and the plaintiff recovered $50,000 from that driver's insurer. *Id.* She also sought recovery under the underinsured motorist coverage section of her own policy, which itself had a limit of $50,000. *Id.* The insurer argued that no coverage existed because the tortfeasor's vehicle was not one whose "limit for bodily injury liability is less than the limit of liability for this coverage" and thus did not fall within the definition of underinsured motor vehicle. *Id.* at 132-33. However, the court found an ambiguity based on the policy's "excess insurance clause," which stated:

> When an insured is occupying a motor vehicle not owned by the insured . . . this insurance is excess over any other insurance available to the insured and the insurance which applies to the occupied motor vehicle is primary.

*Id.* at 132. The court stated:

> Where there is an "excess" or "other insurance" clause that provides the underinsured coverage is excess over all other collectible insurance at the time of the accident, a court may find that language is ambiguous when read with the limit of liability or the definition of underinsured motorist coverage if the other insurance clause may reasonably be understood to provide coverage over and above that collected from the tortfeasor.

*Id.* at 133 (quoting *Zemelman v. Equity Mut. Ins. Co.*, 935 S.W.2d 673, 677-78 (Mo. Ct. App. 1996)). The court resolved the ambiguity in favor of coverage. *Id.* at 134. *See also Chamness v. Am. Family Mut. Ins. Co.*, 226 S.W.3d 199, 202-03, 207 (Mo. Ct. App. 2007) (finding ambiguity based on a definition of underinsured motor vehicle like the one here and an "other insurance" clause stating, "any insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over any other similar insurance"; reasoning that "an ordinary person of average understanding would interpret the second sentence of the other

insurance clause to provide coverage over and above any applicable coverage"); *Am. Family Mut. Ins. Co. v. Ragsdale*, 213 S.W.3d 51, 56 (Mo. Ct. App. 2006) (same).

Progressive argues that post-*Rodriguez* decisions such as *Seeck, Chamness, and Ragsdale* involve ambiguities not found in Progressive's policy, or that are otherwise factually distinguishable. (Doc. 22 at p. 4). I agree. Unlike the insureds in the cases discussed above, Jaudes is not seeking coverage with respect to a vehicle he does not own, nor does he suggest that his policy's "Other Insurance" clause appears to provide excess coverage in his situation.

In response (and in his cross-motion for summary judgment) Jaudes argues that even though Progressive's policy may not contain the type of provisions analyzed in *Seeck* and other similar cases, there are several other provisions in Progressive's policy that create ambiguity, including (1) the declarations page's unqualified statement that the policy provides underinsured motorist coverage with a $50,000 per-person limit (in combination with the definition of declarations page); (2) the Insuring Agreement's statement that Progressive "will pay for damages that an insured person is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of bodily injury . . . . arising out of the ownership, maintenance, or use of **an underinsured motor vehicle**"; and (3) the Limits of Liability section's statement that the declarations page's $50,000 limit is "the most **we** will pay for all damages due to **bodily injury** to one person." Jaudes argues that these ambiguities require the Court to construe the underinsured motorist coverage in Progressive's policy as excess coverage—in other words, coverage over and above what Cook's policy provided. In support of his position, Jaudes cites *Long v. Shelter Insurance Cos.*, 351 S.W.3d 692 (Mo. Ct. App. 2011); *Miller v. Ho Kun Yun*, 400 S.W.3d 779 (Mo. Ct. App. 2013); and *Fanning v. Progressive Northwestern Insurance Co.*, 412 S.W.3d 360, 365-66 (Mo. Ct. App. 2013).

*Long*, 351 S.W.3d 692, does not support Jaudes' position. Under the "Insuring Agreement" in *Long*, the insurer promised to pay "**uncompensated damages**, subject to the limit of **our** liability stated in this coverage" for injuries involving an "**underinsured motor vehicle**." *Id.* at 697. "Uncompensated damages" was defined as "the portion of the damages that exceeds the total amount paid or payable to an insured, by or on behalf of, all persons legally obligated to pay those damages." *Id.* (emphasis omitted). "Underinsured motor vehicle" was defined as "a motor vehicle that is covered by a liability bond or insurance policy applicable to the accident, but its available limits are less than the full amount owed by the owner or operator of that motor vehicle for the insured's damages." *Id.* at 698 (emphasis omitted). The court found that the insuring agreement, read together with these definitions, would lead a reasonable insured to believe that the insuring agreement provided "excess coverage" over and above amounts paid by the tortfeasor. *Id.* at 702-03. Progressive's policy, in contrast, does not contain a promise to pay "uncompensated damages" that "exceed[] the total amount paid [by the responsible party]," nor does it define underinsured motor vehicle in a manner consistent with such a promise. Indeed, the court in *Long* explicitly distinguished the definition of "underinsured motor vehicle" in *Long* from the definition in *Rodriguez* (which was much like the definition in Progressive's policy):

> [T]he *Rodriguez* UIM endorsement specifically tied the definition [of underinsured motor vehicle] to a comparison of liability policy limits from the injury-producing vehicle to the UIM endorsement policy limits for the insured's separate policy. Here, the 'underinsured motor vehicle' definition compared the liability policy limits from the injury-producing vehicle to the total amount of damages owed by the negligent driver causing the injuries . . .

*Long*, 351 S.W.3d at 698 n.7.

*Miller*, 400 S.W.3d 779, cited by Jaudes, is also distinguishable. In *Miller*, the court found that an ambiguity arose when an insuring agreement and declarations page similar to those contained in Progressive's policy were considered in combination with a definition of

underinsured motor vehicle similar to the definition in Progressive's policy.  *Id.* at 787-93. However, as the Eighth Circuit pointed out in *Hughes*, "the *Miller* court relied on a lack of evidence in the record as to whether the defined policy term 'underinsured motor vehicle' was presented in bold type [in the insuring agreement] so as to notify the ordinary reader of its technical meaning."  *Hughes*, 712 F.3d at 396 (citing *Miller*, 400 S.W.3d at 781 n.1); *see also Miller*, 400 S.W.3d at 792 ("When terms are *clearly* bolded, and the insured is *clearly* informed about the significance of bolding, the courts will recognize and enforce the definition specified.").  In contrast, the policy at issue in this case informs the insured that "[d]efined terms are printed in bold-face type," and the term "underinsured motor vehicle" is clearly bolded. (Doc. 34-4, at p. 16).

Moreover, as the Eighth Circuit recognized in *Hughes*, "to the extent that *Miller* conflicts with *Rodriguez*, [the court is] bound to follow *Rodriguez*."  *Hughes*, 712 F.3d at 396.  Where, as here, federal jurisdiction is based on diversity of citizenship, this court is "'bound by the decisions of the Missouri Supreme Court regarding issues of substantive state law.'"  *Id.* at 393 (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).  "'Decisions by the Missouri Court of Appeals may be used as an indication of how the Missouri Supreme Court may rule, but [the court is] not bound to follow these decisions.'"  *Id.* (quoting *Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1068 (8th Cir. 1995)).

Finally, as Jaudes correctly notes, in *Fanning*, 412 S.W.3d 360, the Court of Appeals for the Western District of Missouri recently analyzed language that in almost all respects is identical to Progressive's policy language in this case.  In *Fanning*, the court accepted the arguments advanced by Jaudes in this case.  Specifically, the court in *Fanning* found that ambiguities arising from three provisions required the court to construe Progressive's

underinsured motorist coverage as excess coverage: (1) the declarations page's unqualified statement that the policy provides underinsured motorist coverage with a $50,000 per-person limit (in combination with the definition of declaration page); (2) the Insuring Agreement's promise that Progressive "will pay for damages that an insured person is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury** . . . . arising out of the ownership, maintenance, or use of an underinsured motor vehicle"; and (3) the Limits of Liability section's statement that the declarations page's $50,000 limit is "the most we will pay." *Id.* at 365-68. Jaudes' reliance on *Fanning* is unavailing because, for the reasons detailed below, *Fanning* conflicts with binding precedent by the Missouri Supreme Court, which this Court must follow.

### 1. The Declarations Page and the Definition of "Declarations Page"

The *Fanning* court reasoned that the declarations page permitted the insured "to form the reasonable belief" that the insured had obtained underinsured motorist coverage with a maximum of $50,000 per person, and that the definition of underinsured motor vehicle acted to "nullify" or "limit" that coverage, creating an ambiguity. *Id.* at 366. The *Fanning* court also emphasized that the declarations page contained "no alert" that the tortfeasor's liability insurance had to be less than the amount shown on the declarations page for the coverage to be triggered. *Id.* In so doing, the *Fanning* court suggested that in order to avoid being ambiguous, Progressive's policy would need to state on the declarations page the "manner in which the[] maximum limits [reflected on the declarations page] could be reduced" or "nullified." *Id.*

The *Fanning* court cited no Missouri Supreme Court opinions in support of this position, and this court has found none. Indeed, as Progressive points out in its brief, the Missouri Supreme Court has recognized that "essential terms are usually stated in ***abbreviated form*** on a

declarations page." *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007) (emphasis added). There is nothing about the words used either on Progressive's declarations page or in Progressive's definition of the term "declarations page"[6] that would lead an ordinary person of average understanding to believe that the declarations page in Progressive's policy contains anything more than an "abbreviated form" of the policy's "essential terms." *Id.* To the contrary, the declarations page itself states in large, bold letters that it is an "**Auto Insurance Coverage Summary**," and further states, "Your insurance policy and any policy endorsements contain a full explanation of your coverage."

In addition, neither the declarations page nor the definition of the term "declarations page" contains any language that would lead an ordinary person of average understanding to believe that the promised limit of liability of $50,000 per person was a promise of "excess coverage" over and above any amount paid by a culpable third party. In sum, I find nothing ambiguous or misleading about a policy that offers underinsured motorist coverage in a certain amount on its face sheet and then defines "underinsured motor vehicle" as it is defined here. *See Rodriguez*, 808 S.W.2d at 381-83; *see also Hughes*, 712 F.3d at 394-96 (relying on *Rodriguez* to enforce a definition of "underinsured automobile" similar to the one here, despite the fact that the policy stated on the declarations page that it provided $100,000 in underinsured motorist coverage).

The *Fanning* court's conclusion that Progressive's policy is ambiguous because the declarations page contained "no alert that the [underinsured motorist coverage] is *gap* coverage rather than *excess* coverage" appears to be predicated on the assumption that an ordinary insured purchasing insurance would reasonably expect that a promise of "underinsured motorist"

---

[6] "Declarations Page" is defined in the policy as "the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information."

coverage on the declarations page includes a promise of coverage that is excess over amounts paid by the tortfeasor, regardless of the policy's definitions. *See Fanning*, 412 S.W.3d at 366. Although such an expectation might be a reasonable one, *Rodriguez* expressly prohibits a court from finding an ambiguity solely by giving effect to the insured's reasonable expectation. 808 S.W.2d at 381-83. In the absence of any misleading or confusing language contained in the policy itself, this court must not "unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity where none exists." *Todd*, 223 S.W.2d at 163.

## 2. *The Insuring Agreement*

Although the court in *Fanning* stated that it was holding that "the Insuring Agreement and Limit of Liability portions of the policy . . . render the definition ambiguous by failing to include limiting language regarding the coverage," the *Fanning* court did not analyze any of the language of the Insuring Agreement or explain how it created ambiguity. The *Fanning* court's conclusory finding that the Insuring Agreement renders the definition of underinsured motor vehicle ambiguous is inconsistent with the Missouri Supreme Court's decision in *Rodriguez* and with the plain language of Progressive's policy. Indeed, the relevant language of the Insuring Agreement in *Rodriguez* was substantively identical to the language here: it stated, "We will pay damages which an 'insured' is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle' because of bodily injury . . ." 808 S.W.2d at 381. *See also Hughes*, 712 F.3d 392 (relying on *Rodriguez* and enforcing a definition of "underinsured automobile" similar to the one here in a policy that stated, "**We** will pay compensatory damages **you** are legally entitled to recover from the owner or operator of any **underinsured automobile** for **bodily injury** . . . ."). In the absence of any obvious conflict between the provisions of the

Insuring Agreement and the definition of "underinsured motor vehicle," there is simply no basis for this Court to defer to the state court of appeals' decision in *Fanning*.

### 3. The Limits of Liability Section's "Most We Will Pay" Language and Setoff Provision

In *Fanning,* the court found that the Limits of Liability and setoff provisions of the Progressive policy at issue created an ambiguity in the definition of underinsured motor vehicle because, under the setoff provision, the insurer would never have to pay up to its policy limits.[7] *Id.* at 367-69. *Fanning* does not control here for two reasons. First, the relevant policy language in this case is distinguishable from that in *Fanning*. The Limits of Liability section in *Fanning* began with an unqualified statement that "[t]he limit of liability shown on the declarations page for Underinsured Motorist Coverage is the most we will pay . . ."; the setoff provision came later in the section. In contrast, the policy at issue in this case contains language both at the beginning of and throughout the Limits of Liability section that signals to the insured that the policy limits might be subject to a reduction:

### LIMITS OF LIABILITY

The limit of liability shown on the declarations page for Underinsured Motorist Coverage *will be reduced by all sums*: . . .

The limit of liability shown, *subject to all applicable reductions*, will apply . . .

If **your declarations page** shows a split limit:

1.  The amount shown for "each person" is *the most **we** will pay* for all damages due to **bodily injury** to one person; and  . . .

*These limits are subject to all applicable reductions to the limit of liability set forth above*.

(italics added).

---

[7] For purposes of this opinion, the Court assumes that the tortfeasor's insurance will always pay some amount if the tortfeasor is an "underinsured" (rather than an uninsured) motorist.

Second, to the extent that the policy language here cannot be distinguished from *Fanning*, Jaudes' argument and the court's holding in *Fanning* are in conflict with the Missouri Supreme Court's decision in *Rodriguez*. The relevant policy language in *Rodriguez* was substantively identical to the language in the policy in *Fanning*. The policy in *Rodriguez* provided, "[t]he limit of liability shown in the schedule for this coverage is our maximum liability . . . This is the most we will pay . . . However, the limit of liability shall be reduced by all sums paid [on behalf of the tortfeasor]." *Id.* at 381. The *Rodriguez* court nevertheless enforced the definition of "underinsured motor vehicle" and expressly rejected the plaintiffs' argument that a definition of underinsured motor vehicle like the one here could not be given effect because, if it were, the promised $100,000 limit of liability would never be available to the insured. *Id.* at 382-83.

Similarly, in *Hughes*, the Eighth Circuit rejected the insured's argument that an ambiguity was created because enforcement of a policy definition of underinsured automobile like the one here would mean that the promised $100,000 limit of liability would never be available to the insured. *See* 712 F.3d at 394-95 (citing *Rodriguez*, 808 S.W.2d 379).

The Missouri Supreme Court's decisions in *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 692 (Mo. 2009), and *Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132, 139-40 (Mo. 2009), which were cited by the *Fanning* court, are easily distinguishable from the facts of this case. In both *Jones* and *Ritchie,* it was undisputed that the definition of underinsured motor vehicle was satisfied and that some level of underinsured motor vehicle coverage applied. Indeed, in *Jone*s, the court found that its holding was not contrary to *Rodriguez* because "there was no underinsurance in [*Rodriguez*]." 287 S.W.3d at 692 n.3. In *Hughes*, the Eighth Circuit further clarified that *Jones* did not affect the holding of *Rodriguez* where the issue was the

enforcement of a *definition* of underinsured motor vehicle rather than the enforcement of a setoff provision. *Hughes*, 712 F.3d at 395.

Here, as in *Rodriguez* and *Hughes*, Progressive is not attempting to rely on a setoff provision; rather, Progressive contends there is no underinsured motorist coverage because the definition of "underinsured motor vehicle" is not satisfied. In sum, I find that the clear and unambiguous definition of "underinsured motor vehicle" in Progressive's policy is not satisfied and that none of the policy provisions cited by Jaudes create ambiguity regarding that definition. Thus, Plaintiff is not entitled to coverage under the underinsured motorist provisions of the policy.

## V.   CONCLUSION

For all of the reasons stated above, Progressive has established that it is entitled to judgment as a matter of law. The undisputed facts and controlling Missouri law establish that Plaintiff is not entitled to coverage under Progressive's policy with respect to his accident with Cook, because: (i) Progressive's policy unambiguously prohibits stacking of underinsured motorist coverage; (ii) the policy's definition of "underinsured motor vehicle" is not ambiguous; and (iii) Cook's vehicle does not meet the policy's definition of "underinsured motor vehicle." For these same reasons, Jaudes has failed to establish that he is entitled to judgment as a matter of law on his claim for breach of contract. The Court will issue a separate judgment consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 31) is **DENIED**.

The Court will issue a separate judgment consistent with this Memorandum and Order.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of March, 2014.